UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 23-158 (SRN/TNL)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **GOVERNMENT'S TRIAL** |
| v. | ) | **BRIEF** |
| | ) | |
| TRAIGH SEAN TILLMAN, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America by and through its attorneys, Andrew M.
Luger, United States Attorney for the District of Minnesota, and Assistant
United States Attorney Esther Soria Mignanelli, respectfully submits its trial
brief in the above-captioned case.

I.    **TRIAL COUNSEL.**

The United States will be represented by the following counsel:

> Assistant U.S. Attorney Esther Soria Mignanelli
> 300 South Fourth Street, Suite 600
> Minneapolis, MN 55415
> Desk: 612-664-5685
> Cell:  612-500-1884
> esther.mignanelli@usdoj.gov

II.   **INDICTMENT.**

Defendant Traigh Sean Tillman is charged by indictment with one felony
offense: Felon in Possession of Ammunition.

III.  **SUMMARY OF THE EVIDENCE AT TRIAL.**

The United States anticipates the evidence at trial will prove the following facts:

    a.   *Traigh Sean Tillman's Possession of Ammunition during a Shooting on August 7, 2022*

In the early morning hours of August 7, 2022, Mr. Tillman and an unknown number of co-conspirators were hanging out at an abandoned Speedway parking lot located at the intersection of 38th Street and Chicago Avenue in South Minneapolis (the intersection also known as "George Floyd Square").[1] The parking lot is circled below.



---

[1] According to cooperating sources and law enforcement officers, this intersection is believed to be in the middle of the "territory" claimed and protected by the Minneapolis Bloods street gang. The Government does not intend to offer that fact into evidence, or any gang affiliation of Mr. Tillman or his co-conspirators who were identified through DNA evidence as present at the scene of this shooting on August 7, 2022.

Based on a review of surveillance footage from the church on the southside of 38th Street, the victim ("MAO") arrives and parks his vehicle around 3:20 a.m. next to the abandoned Speedway on the northside of 38th Street (just west of the car depicted in the circled section of the image above).

After MAO pulls up in his vehicle, Mr. Tillman[2] appears nearby MAO's vehicle. Mr. Tillman then appears to approach the driver's side of MAO's vehicle while holding a dark object in his right hand.[3]



TILLMAN

---

[2] As discussed *infra*, Section III.c., Mr. Tillman is not identifiable in this video alone, but has been identified as this man in the video, in part, based on: his clothing and shoes (as depicted in clearer club surveillance footage from earlier that night and as collected by officers from the hospital shortly after the shooting), location data from his phone that is consistent with his presence at this scene, and DNA collected from the scene.

[3] While the dark object in Mr. Tillman's hand is not crystal clear in this video, the video later shows a muzzle flash emanating from it, as well as a number of other muzzle flashes emanating from the parking lot when MAO is shot several times—the muzzle flashes are confirmed to be gunshots both by a Shotspotter recording and by the recovery of 25 discharged cartridge casings at the scene by Minneapolis Police Department officers.

Mr. Tillman then opens the driver's side door and begins to scuffle with MAO, in a manner that is consistent with Mr. Tillman trying to pull MAO out of the vehicle. Mr. Tillman is mid-scuffle with MAO when a co-conspirator, later identified as Sylvester Jernagin, walks up to assist Mr. Tillman.



While the three of them—MAO, Mr. Tillman, and Mr. Jernagin—were standing next to MAO's vehicle, a muzzle flash appears to emanate in the space between MAO and Mr. Tillman.

Mr. Tillman and Mr. Jernagin then move away from MAO, and shortly after, a muzzle flash comes from the gun in Mr. Tillman's hand. After the muzzle flash, Mr. Tillman begins limping away from the street, in a circular manner at first, before limping back into the Speedway parking lot area.[4]

---

[4] Mr. Tillman would arrive at Hennepin County Medical Center minutes later with a gunshot wound exhibiting an oblique orientation and entry and exit points in

Around the same time, an unknown number of other firearms are fired from the abandoned Speedway parking lot toward MAO, who was stumbling at the time in the middle of 38th Street, trying to make his way south. MAO then collapses, and several vehicles file out of the abandoned Speedway parking lot. The muzzle flashes coming from the parking lot, as well as the impact they had on MAO, the bullet wounds sustained by MAO, and the multiple 911-callers who reported hearing shots fired all confirms that the flashes of light observed in this video are caused by the firing of firearms.

b. *Discharge Cartridge Casing from Mr. Tillman's Ammunition Collected as Evidence at the Scene*

Around 3:30 a.m. on August 7, 2022, Minneapolis Police Department officers responded to a shots fired call originating near George Floyd Square. Officers found MAO lying on the southside of 38th Street just west of Chicago Avenue, in between the abandoned Speedway parking lot and the church across the street.

Officers also called for Emergency Medical Services ("EMS"), who pronounced MAO dead at the scene.[5] Officers then collected evidence from the

---

the front of his quadricep of his left leg. Mr. Tillman likely shot himself in the leg while standing to the east of MAO's vehicle on 38th Street.

[5] The government does not intend to offer the fact of MAO's death into evidence through testimony of the officers or the medical examiner. However, some of the video footage may suggest a death occurred, because of the number of times MAO appeared to have been shot, the way he collapsed in the street, and the fact that his body was not immediately moved by EMS. The parties have been discussing the scope of video

scene, including surveillance footage from the church and twenty-five discharged cartridge cases ("DCCs"). Among the 25 DCCs collected, all were 9mm caliber—one from inside MAO's vehicle and 23 from the parking lot. Only one was collected from the east side of MAO's vehicle on 38th Street (the general area where Mr. Tillman is depicted in the video limping back to the parking lot). This DCC is depicted below.



c.   *Identification of Traigh Sean Tillman at the Scene*

Based on a review of security footage from a nightclub in Minneapolis, the clothing and shoes Mr. Tillman was wearing that night is consistent with

footnote that the defense does not find objectionable and will have a more fulsome update for the Court on this issue at the pretrial conference on February 7, 2024.

how his clothing and shoes appear in the video of the shooting, including his distinctive shoes and a lighter shirt bearing a line-style design across the right-side of his chest and a darker-shaded right sleeve:



The appearance of the physical clothing and shoes that officers seized from Mr. Tillman's hospital room that night will also be offered into evidence and are consistent in their appearance to how Mr. Tillman is depicted in each of the videos to be offered. Below is an image of Mr. Tillman's clothing, as it appeared in his hospital room:



Further, investigators obtained a warrant for historical cell site location data for Mr. Tillman's phone number ending -0216. An expert will testify that, based on his analysis of the data, Mr. Tillman's phone moved from the area of George Floyd Square to the Hennepin County Medical center between around 3:22 a.m. and 3:27 a.m. on August 7, 2022. It was also located in the area of some of the bars where Mr. Tillman is seen on video surveillance from earlier that night.

Further, Mr. Tillman lied to his treating professionals at the hospital (he stated that he was shot while talking to a girl outside of a club) and left the hospital early, against medical advice.

While processing the scene of the shooting, MPD Forensic Scientists swabbed multiple beer bottles, water bottles and caps, and a bloody stain in

one of the areas where Mr. Tillman is depicted walking in the video of the shooting, right after he is shot in the leg. A Forensic Scientist from the Minnesota Bureau of Criminal Apprehension ("BCA") Forensic Science Laboratory performed DNA testing on the swabs. The same single source DNA profile from the stain in the street appears on Mr. Tillman's clothing. And at least one of Mr. Tillman's friend's DNA appeared at the scene. Specifically, Mr. Jernagin "cannot be excluded from being a possible contributor to" the DNA mixture found on one of the water bottles from the Speedway parking lot. Whereas "it is estimated that greater than 99.9999999999% of the general population can be excluded from being contributors to [that] mixture."

d.   *Traigh Sean Tillman's Facebook Account Demonstrates a Connection to Jordan Edwards and Sylvester Jernagin As Well As Mr. Tillman's Knowledge of Firearms and Ammunition*

Mr. Tillman's Facebook account was identified in this investigation as having the vanity name "traigh.tillman.1" and a "user" listed as "Traigh Fatman Tillman." This account is also associated with Mr. Tillman's phone number ending -0216 (as mentioned above in Section III.c.).

In addition to providing attribution evidence for Mr. Tillman's phone, Mr. Tillman's Facebook account was used to communicate with other Facebook users who were identified to be at the scene of the shooting or in the bars earlier that evening with Mr. Tillman, including Mr. Jernagin and Jordan Edwards.

Mr. Tillman used this Facebook account to discuss and post about firearms and ammunition on multiple occasions.[6] For example, Mr. Tillman asked on August 21, 2020, "should I bring my ghost gun[?]." On June 7, 2020, Mr. Tillman used his account to comment on another user's post with the following photo:



---

[6] The contents of Mr. Tillman's Facebook account were disclosed in June 2023 and are voluminous (exceeding 30,000 pages). Contemporaneous to this filing, a summary FBI 302 report of those contents were disclosed to the defense. By January 19, 2024, the government will provide a copy of its proposed exhibit from Mr. Tillman's Facebook account.

IV.   **EVIDENTIARY ISSUES**.

a.   *Stipulations.*

The parties are in the process of conferring regarding proposed stipulations related to Mr. Tillman's felony status and that the ammunition at issue, or its component parts, was manufactured outside of the State of Minnesota. Currently, no agreement has been reached, but the parties anticipate having an update for the Court on these communications by the time of the pretrial conference.

b.   *Omnibus Motion Regarding Self-Serving Hearsay, Sequestration, References to Punishment, and Prior-Act Evidence (MILs No. 1-4)*

The Government has filed an omnibus motion in limine addressing several matters that are standard requests prior to jury trials. The Government rests on the points and authorities set forth in that filing.

c.   *Admissibility of Impeachment of the Defendant (MIL No. 5)*

The Government has moved in limine for a pretrial ruling granting the Government permission to use Mr. Tillman's prior 2013 felony convictions of Fifth Degree Drug Possession and First Degree Aggravated Robbery for the limited purpose of impeaching his credibility if he elects to testify in this trial.

Rule 609(b) establishes a presumptive ten-year period of admissibility that runs from the date of conviction, or from the time the witness was released from confinement for the convictions, whichever is later. *See United States v. Stoltz*, 683 F.3d 934, 939 (8th Cir. 2012) (stating "the [ten-year] clock starts at

the witness's release from any physical confinement, or in the absence of confinement, the date of conviction"). For both convictions listed above, the date of release from confinement (June 13, 2015) is within the permissive 10-year period.

Where, as here, the credibility of a testifying defendant is a key consideration in the case, the United States may use a defendant's prior felony conviction to impeach his credibility. In this case, the United States anticipates that if Mr. Tillman chooses to testify, he will offer testimony that directly contradicts the testimony of other witnesses. Accordingly, credibility will be a key factor in this case.

Mr. Tillman's convictions are "highly probative of his credibility 'because of the common sense proposition that one who has transgressed society's norms by committing a felony is less likely than most to be deterred from lying under oath.'" *United States v. Headbird*, 461 F.3d 1074, 1078 (8th Cir. 2006) (overruled on other grounds). The Eighth Circuit has approved the use of felony convictions to impeach testifying defendants under Federal Rule of Evidence 609(a)(1)(B). *See, e.g.*, *United States v. El-Alamin*, 574 F.3d 915, 926 (8th Cir. 2009); *United States v. Jackson*, 310 F.3d 1053, 1054 (8th Cir. 2002); *United States v. DeVore*, 839 F.2d 1330, 1333 (8th Cir. 1987); *United States v. Jackson*, 696 F.2d 578, 589 (8th Cir. 1982); *United States v. Brown*, 956 F.2d

782, 787 (8th Cir. 1992); *United States v. Crawford*, 130 F.3d 1321, 1323 (8th Cir. 1997).

In affirming the district court's decision to admit proof of prior convictions for impeachment of testifying defendants, the Eighth Circuit has noted that the probative value of such impeachment evidence is particularly high where, as here, the jury will be asked to determine the credibility of competing stories by the defendant and the Government's witnesses. As the Eighth Circuit has stated: "Credibility was a key factor in the jury's consideration of the case. Defense and government witnesses presented contradictory testimony regarding possession of the firearm, and possession was the only contested element of the offense." *Headbird*, 461 F.3d at 1078. Other Eighth Circuit cases confirm the probative nature of prior convictions for impeachment purposes where credibility is a central issue. *Crawford*, 130 F.3d at 1323 ("Credibility was at the heart of the jury's fact finding responsibility since possession was the critical issue. The probative value of the evidence was therefore significant. . . ."); *DeVore*, 839 F.2d at 1333 (the "[defendant's] credibility as a witness was central to the jury's resolution . . ."); *Jackson*, 696 F.2d at 589 (noting that the probative value of the prior conviction "was further enhanced by the critical role that [defendant's] credibility would have played in this case if he had chosen to testify"); *Brown*, 956 F.2d at 787 (noting that because jury "had to choose between one version of the events

13

presented by the government's witnesses and another version presented by defendant's," credibility was necessarily a "critical factor in jury's choice," and the defendant's prior burglary conviction was "highly probative" on the issue of credibility).

The United States respectfully requests the opportunity to cross-examine Mr. Tillman regarding his 2013 prior felony convictions should he testify. The United States intends to limit its cross-examination to the fact and nature of his prior offenses as approved by the Eighth Circuit in *Headbird*. 461 F.3d at 1078.

    d.   *Motion to Admit Recorded Statements (MIL No. 6)*

The Government moves to admit the first two audio recordings of the 911 calls that prompted the police response in this case. The 911 calls collectively last about six minutes. The first caller reports that she hears "a lot of gunfire" and when asked how many shots she heard, she responded, "more than 20." The second caller reported hearing "a sh*tload" and a "flurry" of gunfire in the George Floyd Square area. The third caller (not offered by the government) reported "somebody was shot" and "he's just laying here, he's dead" before others on the call state, "he's breathing" and appear to be telling the caller, "he's breathing." The remaining two 911 calls (not offered by the government) either report seeing the victim laying in the street or their review of the church surveillance footage of the shooting. The dispatch records and other BWC video confirm the first officers to the scene arrived within minutes of the first 911 calls beginning.

To facilitate the Court's review of this motion, the Government will submit to Chambers the 911 audio file that is the subject of this motion. (The statements at issue in this motion occur within the first 3 minutes of the audio file).

For the following reasons, the recorded statements are admissible as substantive evidence—as present sense impressions under Fed. R. Evid. 803(1). *See, e.g.*, *United States v. Mitchell*, 726 F. App'x 498, 502 (8th Cir. 2018) (holding that 911 "caller's statements were admissible either as a present sense impression or as an excited utterance" under FRE 803(1) or (2)).  The statements are also non-testimonial, and therefore do not implicate the Confrontation Clause, whether or not the declarants testify at trial.

*Present Sense Impressions.*   Rule 803(1) provides that "[a] statement describing or explaining an event or condition, made while or immediately after the declarant perceived it" is "not excluded by the rule against hearsay." Fed. R. Evid. 803(1).  "The underlying rationale of the present sense impression exception is that substantial contemporaneity of the event and statement minimizes unreliability due to the declarant's defective recollection or conscious fabrication." *United States v. Manfre*, 368 F.3d 832, 840 (8th Cir. 2004).  911 calls are frequently admissible under this hearsay exception. *See, e.g.*, *United States v. Dean*, 823 F.3d 422, 427-28 (8th Cir. 2016) (collecting cases and noting that 911 calls that are placed with "sufficient contemporaneity" are admissible under the present sense impression hearsay exception; upholding admission of 911 call as a

present sense impression where caller described assault in detail, moments after it occurred).

In this case, all the statements at issue were made within seconds or minutes of the shooting on August 7, 2022. Both callers were describing "an event or condition, made while or immediately after the declarant perceived it." Fed. R. Evid. 803(1); *see Mitchell*, 726 F. App'x at 502 (holding 911 call admissible as present sense impression where "caller was describing an ongoing situation in real time, reporting that a gun-carrying man had left the scene of a fight and was proceeding down an alley"). In the 911 calls, the callers are quite literally narrating for the dispatcher what they heard, describing it as "gunfire." To the extent either of these statements describe events that occurred even minutes prior, "[t]here is no *per se* rule indicating what time interval is too long under Rule 803(1)," and the statements were sufficiently contemporaneous under the governing law, particularly given the still-ongoing emergency. *Dean*, 823 F.3d at 427 (citing with approval cases that admitted statements under this exception that occurred 7 minutes and 16 minutes after the relevant event).

*Confrontation Clause.* Finally, the statements do not implicate the Confrontation Clause because they are not testimonial. Statements to dispatch or law enforcement are not testimonial hearsay where the primary purpose of the statements are to enable police to meet an ongoing emergency. *Michigan v. Bryant*, 562 U.S. 344, 377-78 (2011); *see also Davis v. Washington*, 547 U.S. 813,

822 (2006) ("Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency."); *Brun*, 416 F.3d at 707 (excited utterances in 911 call and on scene were not testimonial); *Mitchell*, 726 F. App'x at 502 ("Because the 911 call was made to enable police to identify and apprehend an armed, threatening individual, the caller's statements were not testimonial in nature and thus did not implicate the Confrontation Clause."). "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Bryant*, 562 U.S. at 360.

For these reasons, the Court should admit the two 911 calls, regardless of whether the declarants testify, as non-testimony hearsay exceptions.

e.   *Motion to Admit Facebook Evidence Referencing Gun Possession as Intrinsic Evidence or Under Rule 404(b) (MIL No. 7)*

During the investigation of this case, the Government obtained a federal warrant to search Mr. Tillman's Facebook account, which has Mr. Tillman's profile photo clearly displayed and displays the vanity name "traigh.tillman.1." At trial, the Government seeks to offer certain excerpts from this Facebook data (postings and messages) that contain explicit or implicit references to firearms. A

copy of the proposed exhibit will be disclosed to the defense and will be provided to the Court in connection with this motion.

The time frame of the proposed excerpts spans from 2020 through 2021. As referenced above in Section III, Mr. Tillman posts about and discusses guns using his Facebook account. The Facebook account also establishes a friendship connection between Mr. Tillman and two others connected to the scene of the shooting. Finally, Mr. Tillman's Facebook's account provides attribution evidence to further connect his cell phone to Mr. Tillman, corroborating the anticipated testimony to be offered by the officer who identified that number, as well as the expert witness who will explain the T-Mobile data to the jury.

### i.  *Intrinsic Evidence*

Some of the proposed Facebook posts and messages should be admitted as intrinsic to the charged offense. The latter two categories of data (messages with other suspected co-conspirators and attribution evidence) go straight to the Government's case-in-chief to prove that Mr. Tillman was at the scene of the shooting and was the person depicted in the video appearing to fire a firearm.

### ii.  *Rule 404(b)*

The Government believes the above-listed portions of the proposed Facebook posts and messages should be admitted as intrinsic evidence, but the remaining gun and ammunition-related evidence is also admissible under Rule 404(b).

Evidence is admissible under Rule 404(b)(2) if the act in question "(1) is relevant to a material issue; (2) is similar in kind and not overly remote in time to the crime charged; (3) is supported by sufficient evidence; and (4) its potential prejudice does not substantially outweigh its probative value." *United States v. Banks*, 706 F.3d 901, 906-07 (8th Cir. 2013). The Eighth Circuit has consistently held that "Rule 404(b) is 'one of inclusion, such that evidence offered for permissible purposes is presumed admissible absent a contrary determination.'" *United States v. Williams*, 796 F.3d 951, 958 (8th Cir. 2015) (quoting *United States v. Wilson,* 619 F.3d 787, 791 (8th Cir. 2010)). "Evidence that a defendant possessed a firearm on a previous occasion is relevant to show knowledge and intent . . . ." *United States v. Stroud*, 673 F.3d 854, 861 (8th Cir. 2012) (quoting *United States v. Walker*, 470 F.3d 1271, 1274 (8th Cir. 2006)). Further, prior-act evidence is expressly admissible under Rule 404(b)(2) to show "motive."

As for the first prong, the defendant's statements that expressly or implicitly refer to firearm and ammunition possession are highly relevant to a material issue at trial: whether Mr. Tillman possessed the charged firearm and whether Mr. Tillman, as a prohibited person, had the knowledge and ability to acquire a firearm. The posts and messages about guns also make clear that Mr. Tillman carries firearms for "protection." For example, on August 21, 2020, Mr. Tillman stated, "show I bring my ghost gun or nah I could catch that mfcka," suggesting he is in a conflict with someone else. In another message thread, on

19

August 8, 2020, Mr. Tillman replied to someone (expressing something "scary" had happened in their home), "Yea I got this big a\*\* shotgun for that exact reason this a house weapon."

The Government is mindful that "it is not enough for the government simply to claim, in any firearm case, that such evidence 'goes to the defendant's knowledge and intent' and therefore meets the relevance prong of our Rule 404(b) test." *United States v. Drew*, 9 F.4th 718, 726 (8th Cir. 2021) (Kelly, J., concurring).  However, here, the Government does not intend, as in *Drew*, to simply rattle off several years-old convictions for gun-related offenses, without articulating any relevance to the case at hand beyond "once a gun possessor, always a gun possessor."  *Id.* at 727-28 & n.6.

The evidence here is the defendant's own words, providing a direct glimpse into his own state of mind, and shedding crucial light on his motivation for possessing a gun. The defendant's familiarity with guns and his motive to possess them for protection and respect are highly relevant inferences in this case, particularly since the video footage appears to show Mr. Tillman in conflict with the victim.  Further, a gun was not located in Mr. Tillman's possession, but he is charged with the DCC from his ammunition that was recovered from the scene. Mr. Tillman's defense at trial will almost certainly involve a claim that the ammunition was not his, and was never in his possession.  The Government should be permitted to prove the reasons that Mr. Tillman would have had it in

his possession, especially because it is the Government's burden to prove Mr. Tillman's intent. *See United States v. Sills*, 120 F.3d 917, 920 (8th Cir. 1997) (where defendant denied knowledge of gun found in his car, testimony regarding his statements three years prior about gang membership was "relevant to establish motive and opportunity").

Because all these non-propensity purposes go directly to proving Mr. Tillman's knowing possession of the charged firearm, the evidence is relevant and admissible. *See Drew*, 9 F.4th at 727 (Kelly, J., concurring) ("Evidence of a defendant's prior conduct is inadmissible when its relevance comes *solely* through the character-based inferences Rule 404(b) seeks to prevent.") (emphasis added).

Regarding the second prong, the evidence is abundantly similar in kind: the proffered Facebook evidence contains clear references to possession and use of a firearm and ammunition. And the evidence is not overly remote in time: the posts precede the charged crime by a mere one to two years. *E.g.*, *United States v. Foster*, 344 F.3d 799, 802 (8th Cir. 2003) (nine years not too remote in time) (citing *United States v. Williams*, 308 F.3d 833, 837 (8th Cir. 2002)) (twenty year-old conviction not too remote in time).

As to the third prong, the evidence at issue is the defendant's *own statements* posted to his own Facebook page that displays his selfie photos. This is clearly reliable evidence.

Finally, the potential prejudice of the evidence does not substantially outweigh its probative value.  First, the evidence is significantly less prejudicial that past *convictions* for gun offenses, the evidence frequently at issue in motions of this nature.  Indeed, the defense is certainly free to argue that the posts/messages do not show Mr. Tillman's actual possession of a gun at all. Further, the Government is not offering posts that make explicit references to gang membership. The content offered speaks only of protection in more general terms. Although some of the postings reference violence, as explained above, the Eighth Circuit has repeatedly affirmed the introduction of evidence of threats or violent acts committed with guns where those acts are probative to show possession of the charged firearm. Guns are tools of violence, and proving possession of a gun frequently implicates its use or potential use in violence.

Finally, it is well established that "a limiting instruction diminishes the danger of unfair prejudice arising from the admission of the evidence." *Stroud*, 673 F.3d at 861 (quoting *Walker*, 470 F.3d at 1275) (noting that a "district court's determination that the probative value of the evidence outweighed any prejudice is afforded substantial deference"); *United States v. Lucas*, 521 F.3d 861, 866 (8th Cir. 2008).  At trial, Model Criminal Jury Instruction for the Eighth Circuit § 2.24 (2022) can be given to the jury, thereby significantly diminishing any risk of unfair prejudice. *See United States v. Paul*, 217 F.3d 989, 999 (8th Cir. 2000) (noting that juries are presumed to follow all instructions of the district court).

For the foregoing reasons, the Court should admit the proposed Facebook exhibit as both intrinsic evidence and under Rule 404(b).[7]

## V.   **WITNESSES.**

At this time, the government anticipates calling approximately 15 witnesses. Most of the government's witnesses will be law enforcement witnesses, including the witnesses involved in the response to the shooting on August 7, 2022.

The government also anticipates calling between four and six expert witnesses. The government will call a Special Agent from the ATF, who will offer testimony regarding the interstate nexus of the charged ammunition. The government will call BCA Forensic Scientist Destiny Axelson, who will offer testimony regarding her analyses of various DNA swabs taken from the scene of the shooting. The government will call FBA CAST Special Agent Chad Edlund, who will offer testimony concerning the location data from Mr. Tillman's cell phone number ending -0216 on the night of the shooting. The government will also call one or two of the medical professionals who provided treatment to Mr. Tillman after he arrived at the emergency room the night of the shooting.

---

[7] In the event the Court does not admit this evidence during the Government's case-in-chief, the Government requests the opportunity to re-raise the issue in the event Mr. Tillman testifies or otherwise puts on a defense case.

Finally, the government intends to introduce certified copies of the Defendant's qualifying predicate felony convictions which prohibit him from possessing firearms. The government also intends to introduce a fingerprint comparison packet compiled by a Fingerprint Technician, which will show that the fingerprints from all of the Defendant's prior convictions match the fingerprints taken from Traigh Sean Tillman for this case. The United States will confer with counsel for Mr. Tillman regarding an *Old Chief* stipulation, but to date, no such stipulation has been agreed upon or executed.

Dated:  January 17, 2024                    Respectfully Submitted,


                                            ANDREW M. LUGER
                                            United States Attorney


                                            *s/ Esther Soria Mignanelli*
                                            BY: ESTHER SORIA MIGNANELLI
                                            Assistant U.S. Attorney